NOT FOR PUBLICATION

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY
## CAMDEN VICINAGE

_____
                                :

JOHN W. PADGETT,             :
                                :

           Plaintiff,     :     Civil No. 09-3731 (RBK)
                                :

           v.             :     **OPINION**
                                :

COMMISSIONER OF SOCIAL    :
SECURITY,                 :
                                :

          Defendant.    :
_____ :

**KUGLER**, United States District Judge:

      This matter comes before the Court on an appeal filed by Plaintiff John W. Padgett from a

decision of the Commissioner of Social Security ("Commissioner") denying Plaintiff disability

insurance benefits pursuant to Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).  For

the reasons expressed below, the Court will affirm the Commissioner's decision that Mr. Padgett

was not entitled to disability insurance benefits.

## I.     BACKGROUND

### A.    Procedural History

      Mr. Padgett is a fifty-year old individual who filed an application with the Social Security

Administration for disability insurance benefits on November 13, 2006 alleging a disability onset

of October 1, 2006.  (R. 183-87.)  Plaintiff's claim with the Social Security Administration was

denied initially on April 20, 2007 and upon reconsideration on August 15, 2007.  (R. 155-58,

162-63.)  Thereafter, he filed a Request for a Hearing with an Administrative Law Judge.  (R. 164.)  An administrative hearing was held before Administrative Law Judge ("ALJ") Edward J. Banas on July 17, 2008.  (R. 26-48.)  The ALJ issued his denial in a decision dated August 19, 2008.  (R. 12-25.)

Plaintiff filed a Request for Review of the ALJ's decision by the Appeals Council on September 17, 2008.  (R. 11.)  On January 8, 2009, the Appeals Council denied Plaintiff's request.  (R. 6-8.)  On May 28, 2009, the Appeals Council set aside the January 8, 2009 denial for review of additional evidence and then denied the request.  (R. 2-5.)  On July 30, 2009, Plaintiff filed this action seeking review of the Commissioner's determination.  (Doc. No. 1.)

### B.    Facts

#### I.    Medical History

While serving as a mechanic in the military in the 1980s, Mr. Padgett suffered injuries when a two and a half ton engine hatch fell on him, striking his neck and head several times.  (R. 32, 37.)  Mr. Padgett was medivacked to a major hospital in Germany where he was treated.  (R. 38.)  Mr. Padgett eventually regained the ability to walk.  (R. 37-38.)  The doctors at the Veterans Affairs Hospital told Plaintiff that his condition would steadily get worse because it is degenerative.  (R. 38.)  After about a year of recovery, Mr. Padgett began to work as a carpenter. Id.  Though he returned to work, Mr. Padgett worked with pain and drank a lot.  Id.  Mr. Padgett collects a service-connected disability pension from the military as a result of this accident and for the injuries he suffered.  (R. 32.)  Mr. Padgett worked as a carpenter until October of 2006, when he stopped working because he was missing more days of work than he was working due to hospital and doctor visits.  (R. 31-32, 38.)

2

On July 27, 2006, Mr. Padgett saw Dr. Plavner of Maryland Primary Care concerning gastrointestinal problems he had been experiencing for about two weeks.  (R. 278.)  Dr. Plavner diagnosed Mr. Padgett with viral gastroenteritis and rectal bleeding and prescribed medication.  (R. 278-79.)  Mr. Padgett was admitted to the Anne Arundel Medical Center that same day complaining of rectal bleeding.  (R. 272-74.)  On July 28, 2006, Dr. Dykman, a specialist in gastroenterology, examined Mr. Padgett at the request of Dr. Plavner.  (R. 280-82.)  Dr. Dykman observed that Mr. Padgett likely had infectious diarrhea and was probably bleeding from a hemorrhoidal source.  (R. 282.)  Due to Mr. Padgett's excessive alcohol intake, Dr. Dykman did not start a certain medication.  Id.  Dr. Dykman strongly counseled Mr. Padgett to stop smoking and drinking.  Id.

On July 29, 2006, police brought Mr. Padgett to the Anne Arundel Medical Center emergency room because Mr. Padgett was extremely intoxicated with a blood alcohol level of .424.  (R. 265.)  Mr. Padgett had taken a gun outside in the yard and started to shoot in the air.  Id.  He stated in the emergency room that he was completely overwhelmed with things in his life and did not know what to do other than get very drunk.  Id.  Mr. Padgett credited his feelings to the gastrointestinal problems he had been having, financial difficulties, and back pain.  Id.  The medical records indicate that Mr. Padgett had no psychiatric history and had never seen a therapist or counselor.  Id.  Mr. Padgett was working as a heavy equipment operator at the time. (R. 266.)

On December 28, 2006, Mr. Padgett visited the Anne Arundel Medical Center emergency room complaining of back pain, spasms, and numbness in both legs.  (R. 286.)  Mr. Padgett was diagnosed with acute exacerbation of chronic back pain.  (R. 290.)  He was prescribed several

medications for the pain, including Motrin and Valium.  (R. 287.)  Dr. Esterowitz, the attending

physician, noted that Plaintiff felt much better after receiving the pain medications and even

walked by himself to get a cup of ice.  (R. 290.)   Mr. Padgett denied suicidal ideation or

exacerbation of depression.  Id.  Mr. Padgett was discharged in a stable condition.  Id.

On January 5, 2007, Mr. Padgett again visited the Anne Arundel Medical Center

emergency room complaining of back pain, stating that he had run out of pain medications and

could not tolerate the pain until his appointment at a hospital the following Monday.  (R. 284.)

He complained of back pain with left-sided paralysis and tingling in both lower extremities.  Id.

The medical records noted that Mr. Padgett suffered from L4, L5, and L6 disk herniations.  Id.

On January 8, 2007, Mr. Padgett was seen for an outpatient visit by Dr. Oates and Dr.

Chakkaravarthi at the Wilmington Veterans Affairs Medical Center complaining of worsening

back pain and new onset radiculopathy.  (R. 304-12.)  Plaintiff was diagnosed with chronic back

pain from degenerative joint disease of spine, neuralgia, neuropathy, hypertension, presumed

thiamine folate deficiency secondary to alcohol use, and depression.  (R. 308.)

Mr. Padgett also underwent a CT scan of the lumbar spine on January 8, 2007.  (R. 312.)

The impression from the CT scan showed that there were mild disk bulges from L3-L4 through

L5-S1; no focal disk herniation; a mild scoliotic deformity; a large bridging osteophyte anteriorly

and along the right lateral aspect of L5-S1; mild bilateral degenerative facet joint changes present

on all three levels; and no evidence of spinal stenosis.  (R. 313.)

Mr. Padgett also underwent an x-ray of the thoracolumbar spine on January 8, 2007.  Id.

The x-ray showed no evidence of disk space narrowing, but there was suspicious mild

degenerative joint disease at the lower thoracic vertebral bodies.  Id.  The remainder of the

4

findings were unremarkable.  Id.

On March 8, 2007, Mr. Padgett returned to the Wilmington Veterans Affairs Medical Center for a follow-up visit and was examined by Dr. Kipnes and Dr. Chakkaravarthi.  (R. 301.) Dr. Chakkaravarthi noted strength was 5/5 in both upper and lower limbs, there was no gross motor or sensory deficit, and gait and speech were normal.  (R. 302.)  Dr. Kipnes observed a mildly enlarged liver, 2+ patellar reflexes, grossly intact sensation in lower extremities, and range of motion limited by pain.  (R. 300.)  Dr. Kipnes's impression of Mr. Padgett was hypertension, depression, chronic back pain secondary to disk herniation, and alcohol dependence resulting in alcoholic hepatitis and macrocytic anemia.  Id.  Dr. Kipnes prescribed continued physical therapy, referred Plaintiff to a psychiatrist, and noted that Plaintiff could possibly be helped by steroid injections or surgery.  Id.

Also on March 8, 2007, Plaintiff was examined by Dr. Malhotra, a specialist in physical medicine and rehabilitation.  (R. 295-96.)  Dr. Malhotra noted that Mr. Padgett was in a transport wheelchair pushed by his father, and transfers from the wheelchair to the table were unsteady and awkward.  (R. 296.)  Mr. Padgett's straight-leg raising test was negative on the right side, but on lifting the left leg to about forty degrees, the patient complained of pain in the left posterior thigh. Id.  Mr. Padgett also had mild tenderness in the lumbar region.  Id.  The neurological examination was normal.  Id.  Dr. Malhotra's impression of Mr. Padgett was chronic low back pain due to mild facet joint arthropathy.  Id.  Dr. Malhotra noted that there was no evidence of a herniated disk on the CT scan, and Mr. Padgett's left leg pain was most likely due to lumbar radiculopathy. Id.  However, the CT scan did not show any focal anatomical lesions to explain the radiculopathy.  Id.  Dr. Malhotra concluded, "The patient's symptoms appear out of proportion to

5

objective findings. I suspect there is a large psychosomatic overlay." Id. Dr. Malhotra prescribed physical therapy for Mr. Padgett. Id.

On March 27, 2007, Mr. Padgett visited Ms. Spackman, a Master of Social Work, for a mental health consultation. (R. 358, 363.) Ms. Spackman noted that Mr. Padgett appeared neat and clean, required use of a cane to walk, and had limited motor activity. (R. 366.) Mr. Padgett was cooperative but seemed somewhat reluctant initially to answer questions. Id. Mr. Padgett's recent and remote memory appeared intact, his affect was constricted, his thought process and content seemed organized and intact, his insight and judgment was full, and he had no barriers to communication. Id. Ms. Spackman diagnosed Mr. Padgett with major depressive disorder (recurrent) and alcohol dependence. Id.

On March 29, 2007, at the request of the Commissioner, Dr. Jensen conducted an internal medicine examination of Mr. Padgett. (R. 316.) Dr. Jensen reviewed the results of Mr. Padgett's January 2007 CT scan and x-rays. (R. 317-18.) Dr. Jensen noted upon examination that Mr. Padgett ambulated with a cane and was very tremulous about standing up unaided on the scale, but was eventually able to stand without help. (R. 318.) Range of motion of the cervical spine and upper extremities was normal. (R. 318-19.) Examination of the lower extremities showed the deep tendon reflexes were 5/5 and equal bilaterally in both lower extremities. (R. 319.) Measurement of the calves revealed a circumference of 10 3/8 inches on the right and 9 ½ inches on the left. Id.

Dr. Jensen's examination of the lumbosacral spine demonstrated normal inspection and palpation. Id. Mr. Padgett's right straight-leg raising in the seated position was painless to ninety degrees. Id. When Mr. Padgett performed the left straight-leg raising, he developed

6

unacceptable pain all up and down his left upper extremity from the buttock to the ankle with as little as fifteen degrees of extension.  Id.  Dr. Jensen noted, however, that Plaintiff was subsequently able to raise his left leg all the way up to the level of the examination table to put on his shoe.  Id.  Forward flexion of the spine was to forty-five degrees, and it was stopped by the affect of unbearable pain on the left lower back and uncontrollable shaking of the torso.  Id.  Dr. Jensen also noted subsequent changes to Plaintiff's ambulation pattern in the examination room, such that both lower extremities began shaking and trembling apparently uncontrollably when attempting to do maneuvers like heel-to-toe walking.  Id.  Dr. Jensen found consistency in Plaintiff's description of the symptoms and the physical findings that other observers had had, which were all supportive of a diagnosis of significant left lower extremity radiculopathy, possibly on the basis of degenerative spine disease.  (R. 320.)

On April 2, 2007, Dr. Clemmer, an orthopedic surgeon, examined Mr. Padgett.  (R. 362.) Dr. Clemmer noted that Mr. Padgett walked quite poorly, as if bearing weight on his left side was very difficult.  Id.  Dr. Clemmer described Mr. Padgett's walk as a "lurching spasmodic kind of gait."  Id.  Dr. Clemmer also observed that Mr. Padgett could not walk on his toes or heels, forward flexion was limited by pain, twist was okay, there was paravertebral muscle spasm bilaterally but left was more tender than right, and tenderness was only noted in the lumbar spine. Id.

Dr. Clemmer agreed with Dr. Malhotra that Mr. Padgett's symptoms were out of proportion to objective findings.  Id.  He noted that the CT scan showed mild bulging and facet degenerative joint disease.  Id.  His impression was intrinsic low back pain secondary to moderate degenerative joint disease and possible L5 nerve-root irritation on the left side.  Id.  Dr.

Clemmer noted that surgery was not needed at that time, but that Mr. Padgett should continue physical therapy.  Id.  Dr. Clemmer's plan included psychiatric input and an electromyograph/nerve conduction study to check Mr. Padgett's nerve-root status.  Id.

On April 5, 2007, Dr. Burlingame, a psychologist, conducted a consultative psychological examination of Mr. Padgett at the request of the Commissioner.  (R. 324-29.)  Dr. Burlingame observed that Mr. Padgett's expressive and receptive language was adequate, and Mr. Padgett's speech was clear and articulate.  (R. 325.)  Mr. Padgett's attention and concentration appeared to be functional and adequate for the entire interview.  Id.  Immediate and short-term memory was good.  Id.  He could remember three objects immediately and after a half-hour delay.  Id.  Mr. Padgett could carry out concrete, three-step directions, identify common objects, repeat simple but complex phrases, and read and execute simple commands.  Id.  His mental status was within normal limits.  (R. 326.)

Socially, Mr. Padgett presented appropriate greeting skills.  Id.  Mr. Padgett said that he had no problem getting along with others, including co-workers and supervisors.  Id.  He denied any feelings of suicidal ideation or anxiety.  Id.  Mr. Padgett scored within the moderate range of clinical depression on the Beck Depression Inventory II, and he scored within the moderate range of anxiety symptoms on the Beck Anxiety Scale.  Id.  Dr. Burlingame concluded that the impact of Mr. Padgett's symptoms would be that his concentration and task persistence would likely be poor due to depression and pain; that Mr. Padgett's ability to tolerate work-related stresses and demands was deemed nil; and that Mr. Padgett had average ability to understand and average memory without cognitive impairment.  Id.

On April 9, 2007, Mr. Padgett was seen for a neurology consult by neurologist Dr.

8

Hooker.  (R. 361.)  Dr. Hooker observed that Plaintiff could rise from a chair without using his arms, his gait was antalgic, and he used a cane for support.  Id.  Dr. Hooker observed that Mr. Padgett's right lower extremity seemed shorter than the left and recommended a lift in his right shoe.  Id.  Dr. Hooker reviewed the findings of the CT scan of January 2007.  Id.  Mr. Padgett reported that tramadol and cyclobenzaprine helped reduce his pain.  Id.  Dr. Hooker gave Mr. Padgett exercise instruction sheets to combat low back pain.  Id.

On April 10, 2007, Dr. Ahn reviewed Mr. Padgett's file and completed a physical residual functional capacity assessment.  (R. 330-37.)  Dr. Ahn noted diagnoses of degenerative joint disease and lumbar radiculopathy.  (R. 330.)  Dr. Ahn found that Mr. Padgett could occasionally lift twenty pounds and frequently lift ten pounds and during an eight hour work day with normal breaks could stand and/or walk for a total of at least two hours, sit for a total of about six hours, and push and/or pull for a limited amount in lower extremities.  (R. 331.)  Dr. Ahn noted that Mr. Padgett could occasionally climb a ramp or stairs, stoop, kneel, crouch, and crawl, but Mr. Padgett could never balance or climb a ladder, rope, or scaffolds.  (R. 332.)  Dr. Ahn indicated that Mr. Padgett did not have any manipulative, visual or communicative limitations.  (R. 333-34.)  Dr. Ahn indicated that Mr. Padgett should avoid all exposure to environmental hazards such as machinery and heights, but had no other environmental limitations.  (R. 334.)  On August 1, 2007, Dr. Koppelman read the evidence from the initial claim and the reconsideration/appeal and reaffirmed the physical residual functional capacity assessment findings of Dr. Ahn of April 10, 2007.  (R. 417.)

On April 19, 2007, Dr. Lessans reviewed Mr. Padgett's file and completed a mental residual functional capacity assessment and psychiatric review technique.  (R. 338-55.)  Based on

her assessment of nine categories listed in the psychiatric review technique form, Dr. Lessans identified three categories upon which the medical disposition of Mr. Padgett was based: 12.04 (Affective Disorders), 12.07 (Somatoform Disorders), and 12.09 (Substance Addiction Disorders).  (R. 342.)  Under 12.04, Affective Disorders, Mr. Padgett suffers from depressive disorder not otherwise specified and major depression.  (R. 345.)  Under 12.07, Somatoform Disorders, Mr. Padgett suffers from pain.  (R. 348.)  Under 12.09, Substance Addiction Disorders, Mr. Padgett suffers from alcohol dependence.  (R. 350.)

Dr. Lessans assessed Mr. Padgett's mental residual functional capacity and found that Mr. Padgett was "moderately limited" in his ability to carry out detailed instructions, maintain attention and concentration for extended periods, complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, and travel in unfamiliar places or use public transportation.  (R. 338-39.)  Dr. Lessans concluded that Mr. Padgett had moderate limitations in his activities of daily living, primarily due to physical problems; that Mr. Padgett could interact with others socially; and that Mr. Padgett had moderate difficulties in maintaining concentration, persistence, and pace.  (R. 340.)

Based on the same three categories, Dr. Lessans performed the psychiatric review technique.  (R. 342.)  Dr. Lessans found that Mr. Padgett had the following functional limitations under the "B" criteria: "moderate" restriction of activities of daily living; "mild" difficulties in maintaining social functioning; "moderate" difficulties in maintaining concentration, persistence, and pace; and one or two episodes of decompensation, each of extended duration.  (R. 352.)  Dr. Lessans concluded that the evidence did not establish the presence of the "C" criteria.  (R. 353.)

Dr. Lessans based her findings on hospital records, the Veterans Affairs Medical Center's records, the findings of consultative examiners Dr. Jensen and Dr. Burlingame, and Mr. Padgett's activities of daily living form. (R. 354.) On August 13, 2007, Dr. Dale, a specialist is psychology, reviewed the pertinent medical evidence concerning Mr. Padgett and affirmed the mental residual functional capacity and psychiatric review technique findings of Dr. Lessans dated April 19, 2007. (R. 418.)

On August 21, 2007, Dr. Subbaraya, a primary care physician, examined Mr. Padgett for management of hypertension, back pain, and shoulder pain. (R. 425.) Dr. Subbaraya noted that Mr. Padgett continued to complain of back and shoulder pain, but tramadol and flexeril improved symptoms. Id. Dr. Subbaraya also noted that Mr. Padgett was taking citalopram for depression, currently had no depression symptoms, and had reduced his alcohol use. Id. Dr. Subbaraya noted that Mr. Padgett lived alone in a single level home, with satisfactory activities of daily living, although Mr. Padgett admitted to taking baths instead of showers for fear of falling. Id.

On physical examination, Dr. Subbaraya noted 5/5 strength on Mr. Padgett's upper extremities and 4+/5 in the lower extremities, worse on the left; reflexes 2+ in the upper extremities and lower extremities bilaterally; normal gait; and no antalgia. (R. 426.) Dr. Subbaraya advised Mr. Padgett to continue tramadol and flexeril for his back and shoulder pain. (R. 427.)

On September 4, 2007, electromyograph/nerve conduction studies were done on Mr. Padgett's left lower extremity. (R. 423-24, 431-33.) On physical examination, Dr. Malhotra noted no atrophy in the thigh, leg, or foot musculature; motor strength was full throughout except for mild give-way weakness on the left side; grossly intact sensory examination; reflexes brisk at

11

the knees and 2+ at the ankles; and negative root tension signs.  (R. 432.)  Dr. Malhotra

concluded that the study was normal.  (R. 433.)  The examination revealed no evidence of

lumbosacral radiculopathy, peripheral neuropathy, or entrapment neuropathy affecting the left

lower extremity.  Id.

On October 15, 2007, Mr. Padgett was seen by Dr. Fleurant and Dr. Subbaraya for a

follow-up and management of hypertension, anemia, chronic back pain, depression, and

neuropathy.  (R. 420.)  Mr. Padgett's strength was 5/5 in his upper extremities and 4/5 in his

lower extremities bilaterally, with questionable effort.  (R. 421.)  Mr. Padgett's reflexes were 2+

in upper extremities and lower extremities bilaterally, and his gait was normal.  Id.  The medical

records indicate that Mr. Padgett's back and shoulder pain were stable, and Mr. Padgett should

continue taking tramadol and flexeril.  Id.

### ii.      The Administrative Hearing and the ALJ's Decision

Mr. Padgett, a high school graduate, lives alone.  (R. 33.)  He cleans his house and does

his laundry with difficulty.  Id.  He has to sit down when he vacuums, and although he has a car

and his driver's license, he does not drive much.  (R. 34.)  When he has a doctor's appointment

or something that requires driving a long distance, Mr. Padgett's father drives him.  Id.  When

Mr. Padgett is feeling bad, he uses a walker to get around his house.  (R. 33.)  Mr. Padgett shops

for groceries about every two weeks and only goes out when he has to.  (R. 217, 219.)  It often

takes between a half hour and one hour for Mr. Padgett to get out of bed in the morning.  (R. 39.)

At his administrative hearing before Administrative Law Judge Banas on July 17, 2008,

Mr. Padgett testified that he has had problems walking ever since he stopped working, and,

although there are good and bad days, the bad days are coming more frequently.  (R. 33.)  Mr.

Padgett testified that he cannot do any lifting.  Id.  Mr. Padgett further testified that he has pain all the time, which radiates down the outside of his left leg, and he has partial paralysis in his left leg, which affects the outside of his left leg all the way down to the first three toes of his foot. (R. 35.)  Mr. Padgett described his pain as sharp stabbing pain in the lower back, which calms down to a dull constant pain after he takes his medication.  (R. 39.)  Mr. Padgett testified that if he moved wrong or stepped in a hole or sneezed too hard, the pain stabbed him in the back and reverted back to a dull burning pain, although the pain never went away.  Id.

Mr. Padgett testified that he could sit for twenty minutes before he would become uncomfortable and stand in place for about ten minutes before he would need to sit down.  (R. 41.)  Mr. Padgett further testified that he could walk fifty feet before he would become uncomfortable and that he could not climb or bend over.  (R. 42.)

Dr. Leviton, a Vocational Expert ("VE"), testified at the administrative hearing.  (R. 44.) Dr. Leviton testified that Mr. Padgett's vocational background showed that Mr. Padgett was a residential carpenter, which was classified as medium-skilled with no transferable skills.  (R. 44-45.)  The ALJ asked the VE what vocational impact symptoms like pain and depression could have on a person's ability to do any jobs, and the VE responded that those symptoms could affect concentration, attention, persistence and pace, and if it was severe enough, would result in a loss of productivity.  Id.  The VE further stated that if there was a loss of productivity greater than fifteen or twenty percent, the symptoms would be too severe to permit any kind of employment. Id.

The ALJ  asked the VE to consider a younger individual, not yet fifty years old, with a high school education, prior work history similar to that of Mr. Padgett, and with all the

symptoms and limits to which Mr. Padgett testified.  Id.  The VE testified that the hypothetical

individual would not be capable of any jobs due to a loss of productivity.  Id.

      The ALJ then presented the VE with a hypothetical individual of the same age, education,

and work experience as Mr. Padgett, who had a residual functional capacity to perform sedentary

work as defined in the Dictionary of Occupational Titles (DOT), with the limitation that the jobs

would have to be simple routine in nature, provide for the opportunity to occasionally change

positions to relieve partial discomfort, and be free from hazards such as moving machinery and

uneven ground.  (R. 45-46.)  The VE testified that the hypothetical individual could perform the

work of a taper for printed circuit boards (DOT No. 017.684-010), which was unskilled sedentary

work and totaled over 56,000 positions nationally and 300 positions locally; final assembler

(DOT No. 713.687-018), which totaled over 62,000 positions nationally and 200 positions

locally; and addresser (DOT No. 209.587-010), which totaled over 30,000 positions nationally

and 300 positions locally.  (R 46-47.)  The VE further testified that the use of a cane for

ambulation to move around would likely not be a problem for any of these positions because all

of the positions were sedentary jobs.  (R. 47.)  The VE finally stated that his testimony was

consistent with the DOT, except for the sit/stand option for changing positions, which he stated

was not identified in the DOT but was based on over twenty years of experience as a vocational

rehabilitation counselor.  Id.

      In his decision of August 20, 2008, ALJ Banas concluded that Mr. Padgett met the

insured status requirements of the Social Security Act through December 31, 2011.  (R. 17.)  The

ALJ concluded that Mr. Padgett had not engaged in substantial gainful activity since November

7, 2006.  Id.  The ALJ further concluded that Mr. Padgett had the following severe impairments:

degenerative disk disease, depression, and a history of substance abuse disorder.  Id.  However, the ALJ also concluded that Mr. Padgett's impairments did not meet or medically equal any of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (R. 18.)  The ALJ found that Mr. Padgett had the residual functional capacity to perform sedentary work as defined in the Dictionary of Occupational Titles, which is simple and routine in nature, provides for occasional changes in position to relieve postural discomfort, and must avoid hazards such as heights, moving machinery, and uneven ground.  (R.20.)  The ALJ found that Mr. Padgett could not perform any of his past relevant work.  (R. 23.)  The ALJ concluded that given Mr. Padgett's age, education, and work experience, there were jobs that exist in significant numbers in the national economy that Mr. Padgett could perform.  (R. 25.)  Thus, the ALJ held that Mr. Padgett was not under a disability nor entitled to disability insurance benefits.  Id.

## II.   STANDARD OF REVIEW

District court review of the Commissioner's final decision is limited to ascertaining whether the decision is supported by substantial evidence.  Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999) (citing 42 U.S.C. § 405(g)).  Substantial evidence is "'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  Morales v. Apfel, 225 F.3d 310, 316 (3d Cir. 2000) (quoting Plummer v. Apfel, 186 F.3d 422, 427 (3d Cir. 1999)).  If the Commissioner's determination is supported by substantial evidence, the Court may not set aside the decision, even if the Court "would have decided the factual inquiry differently."  Fargnoli v. Massanari, 247 F.3d 34, 38 (3d Cir. 2001) (citing Hartranft, 181 F.3d at 360).

Nevertheless, the reviewing court must be wary of treating "the existence vel non of

15

substantial evidence as merely a quantitative exercise" or as "a talismanic or self-executing

formula for adjudication."  Kent v. Schweiker, 710 F.2d 110, 114 (3d Cir. 1983) ("The search for

substantial evidence is thus a qualitative exercise without which our review of social security

disability cases ceases to be merely deferential and becomes instead a sham.").  The Court must

set aside the Commissioner's decision if the Commissioner did not take into account the entire

record or failed to resolve an evidentiary conflict.  Schonewolf v. Callahan, 972 F. Supp. 277,

284-85 (D.N.J. 1997) ("Unless the [Commissioner] has analyzed all evidence and has sufficiently

explained the weight he has given to obviously probative exhibits, to say that his decision is

supported by substantial evidence approaches an abdication of the court's duty to scrutinize the

record as a whole to determine whether the conclusions reached are rational."  (quoting Gober v.

Matthews, 574 F.2d 772, 776 (3d Cir. 1978))).  Furthermore, evidence is not substantial if it

constitutes "not evidence but mere conclusion," or if the ALJ "ignores, or fails to resolve, a

conflict created by countervailing evidence."  Wallace v. Sec'y of Health & Human Servs., 722

F.2d 1150, 1153 (3d Cir. 1983) (citing Kent, 710 F.2d at 114).

## III.    DISCUSSION

For disability insurance benefits, a claimant must meet the insured requirements of the

Social Security Act.  An impairment, even an impairment which rises to a disabling level, cannot

be the basis for a determination of disability when the impairment arose or reached disabling

status after the date last insured.  See DeNafo v. Finch, 436 F.2d 737, 739 (3d Cir. 1971).  The

determination of disability before the date last insured must be demonstrated through medical

evidence.  Id.; see also Manzo v. Sullivan, 784 F. Supp. 1152, 1156-57 (D.N.J. 1991).

The Commissioner conducts a five-step inquiry to determine whether a claimant is

16

disabled.  20 C.F.R. § 404.1520; Jones v. Barnhart, 364 F.3d 501, 503 (3d Cir. 2004).  The

Commissioner first evaluates whether the claimant is currently engaging in a "substantial gainful

activity."  Such activity bars the receipt of benefits.  20 C.F.R. § 404.1520(a).  The

Commissioner then ascertains whether the claimant is suffering from a severe impairment,

meaning "any impairment or combination of impairments which significantly limits [the

claimant's] physical or mental ability to do basic work activities."  20 C.F.R. § 404.1520(c).  If

the Commissioner finds that the claimant's condition is severe, the Commissioner determines

whether it meets or equals a listed impairment.  20 C.F.R. § 404.1520(d).  If the condition is

equivalent to a listed impairment, the claimant is entitled to benefits; if not, the Commissioner

continues to Step Four to evaluate the claimant's residual functional capacity (RFC) and analyze

whether the RFC would enable the claimant to return to her "past relevant work."  20 C.F.R. §

404.1520(e).  The ability to return to past relevant work precludes a finding of disability.  If the

Commissioner finds the claimant unable to resume past relevant work, the burden shifts to the

Commissioner to demonstrate the claimant's capacity to perform work available "in significant

numbers in the national economy."  Jones, 364 F.3d at 503 (citing 20 C.F.R. § 404.1520(f)).

　　　Here, ALJ Banas concluded that Mr. Padgett met the insured requirements of the Social

Security Act until December 31, 2011.  (R. 17.)  The ALJ then properly conducted the five-step

inquiry to conclude that Mr. Padgett was not entitled to disability insurance benefits.  First, the

ALJ concluded that Mr. Padgett had not engaged in substantial gainful activity since November

7, 2006.  Id.  Based on Mr. Padgett's extensive medical records, the ALJ then concluded that Mr.

Padgett had three severe impairments: degenerative disk disease, depression, and history of

substance abuse disorder.  Id.  Despite identifying Mr. Padgett's severe impairments in step two,

the ALJ concluded in step three that none of the three impairments met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  Id.  Fourth, the ALJ found that Mr. Padgett had the residual functional capacity of performing sedentary work, which is simple and routine in nature, provides for occasional changes in position to relieve discomfort, and must avoid hazards such as heights, moving machinery, and uneven ground.  (R. 20.)  The ALJ also found that Mr. Padgett was unable to perform any of his past relevant work.  (R. 23.)  Fifth, the ALJ concluded that after considering Mr. Padgett's age, education, work experience, and residual functional capacity, there were jobs that exist in significant numbers in the national economy that Mr. Padgett could perform.  (R. 24.)

Notwithstanding the ALJ's conclusions, Plaintiff contends that the ALJ failed in three ways when considering Plaintiff's request for disability insurance benefits: first, that the ALJ improperly discounted Plaintiff's testimony of disabling pain and limitations pursuant to SSR 96-7p; second, the ALJ failed to properly determine Plaintiff's residual functional capacity; and third, the ALJ failed to follow SSR 00-4p when the ALJ did not give a reasonable explanation for the conflict between the VE's evidence and the Dictionary of Occupational Titles.  Plaintiff also asserts that the administrative record provides a sufficient basis for an award of summary judgment in favor of Plaintiff.

### A.    The ALJ Improperly Discounted Plaintiff's Testimony

Plaintiff first contends that the ALJ improperly discounted Plaintiff's testimony of disabling pain and limitations pursuant to the requirements provided for in 20 C.F.R. 404.1520 and Social Security Ruling 96-7p.  (Pl. Br. 9.)  SSR 96-7p provides that an ALJ must first determine whether there is an underlying "medically determinable physical or mental

impairment(s) that could reasonably be expected to produce the [claimant's] symptoms."  SSR

96-7p.  If the ALJ determines that there is such an impairment or impairments, the ALJ must

evaluate the "intensity, persistence, and functionally limiting effects of the symptoms" and

"determine the extent to which the symptoms affect the individual's ability to do basic work

activities."  Id.  This requires the ALJ to make a finding as to the individual's credibility.  Id.  In

determining an individual's credibility, the ALJ must consider the entire case record, including

all relevant medical evidence, the individual's statements about the symptoms, and any other

relevant information.  Id.  "An individual's statements about the intensity and persistence of pain

or other symptoms or about the effect the symptoms have on his or her ability to work may not be

disregarded solely because they are not substantiated by objective medical evidence."  Id.

Finally, "[t]he determination or decision must contain specific reasons for the finding on

credibility, supported by the evidence in the case record, and must be sufficiently specific to

make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to

the individual's statements and the reasons for that weight."  Id.

    The Third Circuit established a four-step standard to use when considering a claimant's

subjective complaints, which requires:

> (1) that subjective complaints of pain be seriously considered, even
> where not fully confirmed by objective medical evidence; (2) that
> subjective pain may support a claim for disability benefits and may be
> disabling; (3) that when such complaints are supported by medical
> evidence, they should be given great weight; and finally (4) that where
> a claimant's testimony as to pain is reasonably supported by medical
> evidence, the ALJ may not discount claimant's pain without contrary
> medical evidence.

Ferguson v. Schweiker, 765 F.2d 31, 37 (3d Cir. 1985) (internal citations and quotations

omitted).  If an ALJ does not find the subjective claims of an individual credible, however, "the determination or decision rationale must contain a thorough discussion and analysis of the objective medical and the other evidence, including the individual's complaints of pain or other symptoms and the adjudicator's personal observations.  The rationale must include a resolution of any inconsistencies in the evidence as a whole and set forth a logical explanation of the individual's ability to work."  SSR 95-5p; see also Schaudeck, 181 F.3d at 433.

Here, the Court is satisfied that ALJ Banas provided "a thorough discussion and analysis of the objective medical and the other evidence" for finding Mr. Padgett's statements of pain and symptoms not credible.  Id.  The ALJ first concluded that Mr. Padgett's "medically determinable impairments could reasonably be expected to produce the alleged symptoms."  (See R. 21.)  However, the ALJ concluded in the second step under SSR 96-7p that "the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the residual functional capacity assessment."  Id.

Plaintiff argues that the ALJ improperly used Plaintiff's activities of daily living to attack Plaintiff's credibility.  (Pl. br. 11.)  However, 20 C.F.R. § 1529(c)(3)(I) specifically identifies daily activities as one of the many factors to be considered when additional information is needed to evaluate an individual's credibility as to assertions of subjective symptoms.  20 C.F.R. § 1529(c)(3)(I); SSR 96-7p.  Therefore, the ALJ's use of Plaintiff's activities of daily living was proper.

Plaintiff also argues that the ALJ's opinion "failed to consider Plaintiff's testimony regarding all of the factors that precipitate and aggravate Plaintiff's symptoms as well as all of the other measures taken to relieve the pain or other symptoms in accordance with SSR 96-7p."

(Pl. br. 12.)  The ALJ noted in his opinion, however, that the record does not indicate "intensive treatment consistent with the claimant's allegations of disabling pain and functional limitations." (R. 21.)  Despite Plaintiff's claim that a physical therapist told him physical therapy would not relieve his pain, Dr. Malhotra, Dr. Kipnes, and Dr. Clemmer all recommended physical therapy to Mr. Padgett.  (See R. 35-36, 43, 296, 300, 362.)  Dr. Clemmer did not advise surgery, and Dr. Hooker referred Mr. Padgett to vocational rehabilitation.  (See R. 362, 361.)  There is also nothing in the record that indicates Mr. Padgett sought pain management or other forms of similar treatment.  The ALJ noted that Mr. Padgett himself acknowledged that pain medications helped his pain, and although Plaintiff complained of some side effects like fatigue and dizziness, there were no significant adverse side effects from the pain medications noted in the record.  (See R. 21-22.)  In addition, the ALJ noted that nothing in the record indicated that Mr. Padgett reported any adverse effects to any of his treating physicians nor did Mr. Padgett request any changes in medication or dosage.  Id.  Finally, the record does not show that Mr. Padgett was ever prescribed medication for dizziness.  Id.  Thus, it appears to this Court that ALJ Banas took into account Plaintiff's testimony regarding his pain and symptoms and properly concluded that those claims were not credible, due especially to Plaintiff's failure to pursue pain management treatments consistent with the pain he claimed to experience.

Plaintiff also argues that the ALJ did not consider the entire medical record in accordance with SSR 96-7p.  (Pl. br. 13.)  The ALJ, however, distilled the relevant facts in his opinion from more than 400 pages of record and properly came to a finding on Mr. Padgett's credibility.  To be clear, the ALJ must make a finding of credibility on Plaintiff's subjective claims for the purpose of determining the extent to which the symptoms limit the claimant's ability to do basic work

activities.  SSR 96-7p.  Here, Plaintiff argues in his brief that the ALJ failed to consider several findings, including, for example, Dr. Jensen's opinion that Mr. Padgett suffered from significant left lower extremity radiculopathy.  (Pl. br. 13.)  However, in Dr. Jensen's report in the record, Dr. Jensen stated that Plaintiff would be significantly impaired from lifting and carrying objects; however, with respect to handling objects, no impairments were observed.  (See R. 320.)  The ALJ concluded on this point by acknowledging that Mr. Padgett should be limited to lifting and carrying a maximum of ten pounds, and that lifting and carrying should only be done occasionally.  (R. 23.)  Plaintiff also suggests that ALJ Banas "failed to note that the [CT] scan showed the bulging at multiple levels from L3-4 through L5-S1 as well as a large bridging osteophyte anteriorly and along the lateral aspect of L5-S1 with mild bilateral degenerative facet joint changes present at all levels."  (Pl. br. 13 (citing R. 313).)  However, the ALJ is required to consider the medical evidence that would establish that Mr. Padgett's statements of pain and symptoms were credible.  Here, the failure of the ALJ to include the results of the CT scan neither explain Plaintiff's subjective claims nor demonstrate that ALJ Banas failed to consider these results.  Furthermore, the diagnosis that was submitted with the above impression noted that although this was a major abnormality, no attention was needed.  (R. 313.)  Finally, Dr. Jensen's consultative examination was performed on March 29, 2007 and was not informed by the electrodiagnostic studies of September 4, 2007, which revealed no evidence of lumbosacral radiculopathy, peripheral neuropathy, or entrapment neuropathy affecting the left lower extremity.  (R. 316-23, 433.)

Plaintiff also argues that, with respect to his non-exertional impairments, the ALJ rejected Dr. Burlingame's findings concerning Plaintiff's mental functional capacity.  (Pl. br. 14.)

However, the ALJ considered the report of Dr. Burlingame and the other evidence of record and properly concluded that Plaintiff retained the ability to perform simple and routine work.  (R. 22-23.)  The ALJ noted that Dr. Burlingame observed that Mr. Padgett had no problems with attention, concentration, or short-term memory, and Mr. Padgett had the ability to follow three-step instructions.  (R. 22.)  The ALJ also noted that Dr. Burlingame reported that Mr. Padgett was fully oriented, his mental status was within normal limits, and that Mr. Padgett denied anxiety, psychosis, or feelings of worthlessness.  Id.  Dr. Burlingame subsequently expressed an opinion that Mr. Padgett would have poor concentration and task persistence due to his depression and pain, and that his ability to handle work stresses and demands would be "nil."  (R. 23, 326.)  The ALJ was reasonable in giving Dr. Burlingame's subsequent opinion little weight, as it was not supported by Dr. Burlingame's own mental status examination findings.  Therefore, the ALJ acted properly when he rejected Dr. Burlingame's inconsistent opinion.

Plaintiff also argues that the ALJ "completely ignored the findings in the Mental Residual Functional Capacity Assessment completed by State Agency Physician Ellen Lessans, Ph.D., dated April 19, 2007."  (Pl. br. 14.)  Dr. Lessans concluded that Mr. Padgett was moderately limited in his ability to carry out detailed instructions, maintain attention and concentration for extended periods, complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, and travel in unfamiliar places or use public transportation.  (R. 338-39.)  However, the ALJ noted in his opinion that the assessments by the state agency medical consultants, which included Dr. Lessans, were found to be consistent, along with the evidence in the record and Plaintiff's subjective claims, that Plaintiff was limited to simple,

23

routine work.

**B.      Plaintiff's Residual Functional Capacity**

Plaintiff argues that the ALJ failed to properly determine Plaintiff's residual functional capacity (RFC).  (Pl. br. 15-23.)  An individual's RFC is determined by identifying an individual's functional limitations or restrictions and assessing the individual's work-related abilities on a function-by-function basis.  SSR 96-8p; 20 C.F.R. 404.1545(b)-(d).  It is important to note that an individual's "RFC is not the *least* an individual can do despite his or her limitations or restrictions, but the *most*."  SSR 96-8p.

An individual's RFC is calculated at the fifth step of the five-step inquiry for determining eligibility for disability insurance benefits.  20 C.F.R. § 404.1520(f).  Once the Commissioner finds the claimant unable to resume past relevant work, the burden shifts to the Commissioner to demonstrate the claimant's capacity to perform work available "in significant numbers in the national economy," considering the individual's age, education, past work experience, and residual functional capacity.  Jones, 364 F.3d at 503 (citing 20 C.F.R. § 404.1520(f)); 20 C.F.R. § 416.920(e) ("We use our residual functional capacity assessment . . . at the fifth step of the sequential evaluation process . . . to determine if you can adjust to other work.")

Here, Plaintiff argues that the ALJ's decision did "not satisfy the requirements imposed on the Commissioner and fail[ed] to comply with SSR 96-8p."  (Pl. br. 18.)  The Court is unpersuaded.  "The ALJ need only include in the RFC those limitations which he finds to be credible."  Salles v. Comm'r of Soc. Sec., 229 Fed. Appx. 140, 147 (3d Cir. 2007).  Here, the ALJ weighed the entire medical record and included within his opinion the relevant data that informed his RFC assessment.  (See R. 20-23.)  The ALJ properly accepted and relied on the

24

opinion of Dr. Jensen, who stated that Plaintiff "had no impairment in his ability to sit, but was significantly impaired in his ability to lift and carry objects and that his ability to stand and walk was affected by his left lower extremity impairment." (R. 22.) The ALJ further noted that there were no inconsistent medical opinions concerning Plaintiff's functional abilities and concluded that Dr. Jensen's assessment would allow Mr. Padgett to perform unskilled, sedentary work with a sit/stand option.[1] (R. 23.) The ALJ also considered the opinions of the state agency medical consultants, Dr. Ahn and Dr. Koppelman, who found that Mr. Padgett could occasionally lift twenty pounds and frequently lift ten pounds, stand and/or walk for a total of at least two hours, and sit for a total of six hours. (See R. 23, 330-31, 417.) The ALJ found Dr. Ahn and Dr. Koppelman's opinions consistent with Plaintiff's chronic lumbar pain and restricted range of motion, but further limited Plaintiff to lifting and carrying no more than ten pounds occasionally. (R. 23.) Thus, as to Plaintiff's argument that the ALJ failed to list a "function-by-function assessment" in his decision, the Court is satisfied that ALJ Banas considered the entire record and assessed Plaintiff's RFC appropriately.

Plaintiff also argues that the ALJ "gave no explanation as to how 'mild' difficulties in activities of daily living and maintaining social functioning and, more importantly, how 'moderate' difficulties in maintaining concentration, persistence, or pace translate into only the limitation of simple, routine work." (Pr. br. 20.) The ALJ, however, properly relied on the medical examination findings of Dr. Burlingame, which showed that Mr. Padgett could follow

---

[1]"Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." 20 C.F.R. § 404.1567(e).

25

three-step directions, his attention and concentration were functional and adequate, his immediate and short-term memory were good, his mental status was within normal limits, and he had no problem getting along with other people, including coworkers and supervisors.  (See R. 22-23, 325-26, 329.)  The ALJ's mental RFC finding was also supported by the assessments of Dr. Lessans and Dr. Dale.  (See R. 23, 340, 418.)  The ALJ found that Mr. Padgett's "history of depression, with moderate difficulties in concentration, persistence or pace, would further limit the claimant to simple, routine work." (R. 23.)  The ALJ's conclusion is consistent with the Third Circuit's perspective on this issue.  See Menkes v. Astrue, 262 Fed. Appx. 410, 412 (3d Cir. 2008) (stating that moderate limitations in concentration, persistence and pace were accounted for by restricting work to "simple routine tasks").

Plaintiff also argues that "the ALJ did not present Plaintiff's moderate limitation in concentration, persistence, and pace to the VE in his hypothetical question nor did he include it in his RFC finding."  (Pl. br. 21.)  However, as stated above, a claimant's moderate limitation in concentration, persistence, and pace can be accounted for by restricting work to "simple routine tasks."  See Menkes,  262 Fed. Appx. at 412.  Therefore, the ALJ's hypothetical that was presented to the VE accounted for Plaintiff's RFC, including Plaintiff's moderate limitation in concentration, persistence, and pace, and was appropriate.

Plaintiff further argues that the ALJ ignored the assessment conducted by Dr. Lessans, who found that Plaintiff was moderately limited in his ability to maintain attention and concentration for extended periods; to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; and to travel in unfamiliar places or use

public transportation.  (Pl. br. 22.)  However, the ALJ recognized and considered the findings by

the state agency medical consultants, including Dr. Lessans, and other medical assessments from

the Veterans Affairs Medical Center.  (R. 23.)  The ALJ found the assessments to be consistent

with the finding that Mr. Padgett could be limited to simple, routine work.  (R. 23.)  Thus, this

Court concludes that the ALJ considered the entire record and concluded properly that Mr.

Padgett can perform sedentary and simple, routine work.

### C.      The ALJ Failed to Follow SSR 00-4p

The ALJ found that Plaintiff had the RFC to perform sedentary work, which is simple and

routine in nature, provides for occasional changes in position to relieve postural discomfort, and

must avoid hazards such as moving machinery and uneven ground.  (R. 20-23.)  At the

administrative hearing, the ALJ presented the VE with a hypothetical question that mirrored this

RFC.  (R. 45-46.)  Given this RFC, the VE testified that the hypothetical individual would be

able to perform the work of a taper for printed circuit boards, final assembler, and addresser.  (R.

46-47.)  Plaintiff argues that the ALJ failed to follow SSR 00-4p, specifically that the ALJ did

not elicit a reasonable explanation for the unresolved conflicts between the VE's evidence and

the Dictionary of Occupational Titles (DOT).  (Pl. br. 23.)

Plaintiff argues that two of the three jobs identified by the VE – taper and addresser –

conflict with the VE's findings because these jobs require a reasoning level of 2, which requires

the ability to carry out detailed written or oral instructions.  (Pl. br. 23-24.)  Social Security

Ruling 00-4p explains that the DOT lists specific vocational preparation (SVP) time for each

described occupation.  SSR 00-4p.  "Using the skill level definitions in 20 C.F.R. 404.1568 and

416.968, unskilled work corresponds to an SVP of 1-2."  Id.  The jobs of taper, final assembler,

and addresser have an SVP of 2 and are therefore unskilled.  DICOT, No. 017.684-010, 1991 WL

646421 (4th ed. 1991); DICOT, No. 713.687-018, 1991 WL 679271 (4th ed. 1991); DICOT, No.

209.587-010, 1991 WL 671797 (4th ed. 1991).  Plaintiff argues, however, that because the DOT

provides that the jobs of taper and addresser require a reasoning level of 2 and thus require the

ability to carry out detailed instructions, the VE's finding that Plaintiff could perform work as

taper and addresser was erroneous.  (Pl. br. 24.)  However, the fact that the jobs of taper and

addresser require a General Educational Development (GED) reasoning level of 2 is irrelevant

because Plaintiff completed high school and therefore has the GED necessary, according to 20

C.F.R. § 404.1564(b)(4), to do semi-skilled through skilled work.  20 C.F.R. § 404.1564(b)(4).

Here, the ALJ presented the VE with a hypothetical individual who had a high school education

and was capable of performing work that is unskilled and simple and routine in nature.  (R. 46.)

The VE acknowledged the ALJ's hypothetical and indicated that there was no conflict with the

DOT on this matter.  (R. 47.)  Thus, the selection by the VE of taper and addresser as suitable

jobs for Plaintiff was proper for a selection of unskilled simple and routine work.  Furthermore,

even if Plaintiff's argument were to be credited and the jobs of taper and addresser eliminated,

the job of final assembler would still be an appropriate job for Plaintiff, as it requires a reasoning

level of 1.  The existence of this one job in the national economy would be sufficient to support

the ALJ's determination.

Plaintiff also argues that the ALJ failed to follow SSR 00-4p by not eliciting a reasonable

explanation from the VE for the conflict between the VE's conclusion and the DOT.  (Pl. br. 23-

27.)  When the ALJ presented the hypothetical to the VE, the ALJ suggested that the individual

would need to sit and stand at will, which is what the VE understood.  (See R. 46-47.)  The VE

28

testified that his statement was consistent with the DOT, except for the sit/stand option for changing positions.  Id.  The VE stated that the sit/stand option was not in the DOT, but the VE had based her testimony on the VE's twenty-year experience as a vocational rehabilitation counselor.  Id.  The VE also explicitly acknowledged that the hypothetical individual used a cane and testified that the use of a cane for ambulation would likely not be a problem for any of the three jobs because they were all sedentary.  Id.  Social Security Ruling 00-4p provides that "[w]hen there is an apparent unresolved conflict between the VE . . . evidence and the DOT, the adjudicator must elicit a reasonable explanation for the conflict before relying on the VE . . . evidence," and "[n]either the DOT nor the VE . . . evidence automatically 'trumps' when there is a conflict."  SSR 00-4p.  Here, the Court is satisfied that the ALJ elicited a reasonable explanation for the conflict between the VE's testimony and the DOT concerning the sit/stand option.  The VE testified that the sit/stand option would be available for the three jobs she testified to, even though the option was not included in the DOT.  (R. 47.)  This was based on the VE's twenty years of experience as a vocational rehabilitation counselor.  Id.  The ALJ properly relied on this reasonable explanation.

## IV.    CONCLUSION

For the foregoing reasons, ALJ Banas's decision that Plaintiff John W. Padgett is not entitled to disability insurance benefits is supported by substantial evidence in the record, and the decision is **AFFIRMED**.


Date:   8/3/10                                          /s/ Robert B. Kugler
                                                        ROBERT B. KUGLER
                                                        United States District Judge